# EXHIBIT E

# Exhibit E

Declaration of Aaron Woolfson, Athena Bitcoin's Expert

(Jan. 13, 2025)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF FLORIDA**

| | |
|---|---|
| **KEON JACKSON**, on behalf of himself and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**ATHENA BITCOIN, INC.**<br><br>*Defendant* | Case No: **4:24-cv-00331-MW-MJF**<br><br>**DECLARATION OF DEFENDANT'S EXPERT AARON WOOLFSON**<br><br>Before: Hon. Mark. E. Walker<br>Trial Date: October 14, 2025 |

**<u>DECLARATION OF AARON WOOLFSON</u>**

I, Aaron Woolfson, declare as follows under penalty of perjury:

**Purpose of Engagement.**

1. My name is Aaron Woolfson. I am over the age of 21. I am the founder of TelSwitch, Inc. which I started in 1994. I was retained by Freeman Mathis & Gary, LLP, attorneys for Defendant *Athena Bitcoin* ("Athena Bitcoin", or "Athena" or "Defendant") in the above-captioned matter.

2. More specifically, I have been asked to opine whether the Plaintiff's Expert, Anya Verkovskaya, applied a reliable method to identify those residential phone numbers that had sent a "STOP" text message to 57716 received one or more text messages from 57716 more than (30) thirty following that "STOP", and whether her analysis accurately reflected the quantities of messages sent to those telephone numbers that were impacted.

3. As described in this Declaration, it is my conclusion that there are certain deficiencies in Ms. Verkhovskaya's analysis that led to an over-amplification of the quantity of

unique telephone numbers to which messages had been sent following a “STOP”. My critique is primarily focused on , but not limited to, the following two areas:

(a) Ms. Verkhovskaya appears to include messages that had been sent to individuals less than thirty (30) days after a “STOP” had been received by 57716; and,

(b) Ms. Verkhovskaya appears to have included those messages that had been sent to individuals *after* they had re-engaged in further activities with the Defendant that would have necessitated the receipt of additional text messages following the initial “STOP”.

4. In connection with this analysis, I applied a controlled methodology toward the data using the same data principles that I developed and applied over hundreds of TCPA matters, including dozens in which courts had relied upon my opinions. This methodology has been previously tested and assessed, including in *Carroll et al v SGS* (Case No. 3:16-cv-00537-SDD-SDJ, DC, La, Middle District), where I had been tasked with methodically analyzing large sets of calling data using SQL to achieve an objective analysis of those calls that had been made to proposed putative class members, including conducting blind tests upon the data to achieve analysis that could be readily replicable by other experts.

5. Using these methods and procedures, I have compared the methodology to that which had been applied by the Plaintiff’s expert, and in doing so, have identified areas where telephone numbers, and the texts that had been sent to them, were incorrectly included in record counts.

6. I was not retained in this matter to determine the legal standards of any court decisions or their applicability to this case, and I was not involved in the selection of the data provided to me. This report reflects my preliminary analysis of the data and documents provided to me by counsel.

7. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by the Defendant.

8. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial and arbitration appearances.

9. I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**SUMMARY OF OPINIONS**

10. It is my opinion that Ms. Verkovskaya's primary deficiencies are founded primarily in the two following areas:

(a) Ms. Verkhovskaya appears to include messages that had been sent to individuals less than thirty (30) days after a "STOP" had been sent by a phone number to 57716;

(b) Ms. Verkhovskaya appears to have included those messages that had been sent to individuals *after* those individuals had re-engaged in business activity(ies) with the Defendant (e.g. your ATM verification code is XXXXX) that would have necessitated the receipt of additional text messages.

11. As described within this declaration, I undertook steps to replicate Ms. Verkhovskaya's work using similar tools and techniques, and then undertook a careful critique of the underlying data to identify those points within the analysis where I believe that she may have misapplied filters. I believe that in doing so, I have identified specific filters that she misapplied, or failed to apply, that I believe led to her over-inclusion of telephone numbers – telephone numbers that did not fit within the constructs of the steps that she outlined in her report.

## QUALIFICATIONS AND EXPERT ENGAGEMENTS

12. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

13. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified as an expert witness by both Federal and State courts. My testimony on behalf of plaintiffs and defendants has been relied upon by courts in cases filed by an individual, and in class actions lawsuits. My opinions have also been relied upon in arbitrations, including those involving TCPA claims.

14. I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems and relied heavily on my deep understanding of database and timekeeping integration technologies. It also required me to build interfaces to the ACH exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR capabilities as well as enhanced call routing - inbound and outbound - including predictive elements of enhanced call processing, and the precise timings of these events.

15. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers,

financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services.

16. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

17. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

18. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

19. I held a Certificate of Public Convenience and Necessity ("CPCN") - a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a re-issue of my initial CPCN granted to TelSwitch, Inc. on June 10, 1994, which I held for approximately eighteen (18) years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built and programmed, with the phone network for the purpose of providing wholesale and retail telecommunications services.

20. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls and, among other things, compare call records for their inclusion on the national DNC list.

**EXPERTISE RELATED TO DATABASE WORK**

21. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR)). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

22. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin).

23. In addition, I served as an expert in the ABM Industries Overtime Cases (Case No. JCCP 4502, San Francisco Superior Court). Relying upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

24. I was also expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company, Inc., Ag Force, LLC, Fowler Marketing International LLC*, (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in Fowler Packing is attached as Exhibit 4.

25. I have applied similar methods to structure large amounts of unstructured data on behalf of defendants Verizon Wireless and Collecto in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the Northern District of California to reconstruct a database from information that was in Verizon's

possession that the plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 5.

26. (a) In *Keyes v. Ocwen Loan Servicing, LLC* (Case No. 2:17-cv-11492-GAD-SDD, E.D. Mich., S. Div.), I authored an expert report in rebuttal to the person identified by Plaintiff as their expert, Jeffrey A. Hansen. Ocwen's use of the Aspect Unified IP system was at issue in Keyes, and I conducted an inspection of that equipment for my report in Keyes. The court granted Ocwen's motion for partial summary judgment (ECF 96) and entered judgment in favor of defendant (ECF 97). The court held the Court that held "the Aspect System is not an ATDS as a matter of law. . . . Because the Court concludes that no reasonable person could find that the Aspect System is an ATDS, Ocwen is entitled to summary judgment on Keyes's TCPA claims[.]"

27. In *Gaines v. Law Office of Patenaude & Felix A.P.C.* (Case No. 3:13-cv-01556-JLS, S.D. Cal.), I analyzed the telephone records produced by the defendant and describing the operating characteristics of the telephone system that Patenaude & Felix was utilizing to call the plaintiff. I responded to the report prepared by Plaintiff's identified expert, Jeffrey A. Hansen. Class certification was not granted.

28. In *Stein v. Monterey Financial Services, Inc.* (Case No. 13-cv-01336-AKK, N.D. Ala.), I was retained to assist in analyzing records produced by the defendant, Monterey Financial Services, Inc. I provided an expert report and was also asked to respond to the report of the plaintiff's expert written by Randall A. Snyder. Class certification was denied.

Expertise Specifically Related to Outbound Dialing Systems in Call Centers

29. I have over twenty-five years of hands-on experience in telecommunications, in the design and programming of the equipment that handles calls. I was responsible for the development of specialized hardware and software systems, called Rapid Announce and Rapid Record that have been used in both telephone company central offices and in call centers, for the pacing, dialing, and measurement of phone calls, and has cumulatively handled hundreds of millions of calls. At its peak use,

Case 4:24-cv-00531-WEF Document 24-5 Filed 06/03/25 Page 9 of 16

Rapid Announce processed 240,000 inbound and 280,000 outbound calls per day for companies such as First National Collection Bureau.

30. Rapid Announce was primarily used to match the pacing of outbound calls with the availability of agents to accept the calls once they were answered. Rapid Announce also evaluated the connected calls to determine whether the phone was answered by an answering machine or a live person. Based upon the availability of the agents and the type of call that was being placed, the system would then transfer the call to the correct type of agent, or skill-set group, to handle the particular circumstances for which the call was received, or dialed.

31. Rapid Record was responsible for handling the recording and media storage of inbound calls, as well as the implementation of a technology that I developed called AggravationSense. AggravationSense was designed to measure the cadence and speed at which an individual spoke. By measuring the cadence and speed of the speech against a baseline of background noise, AggravationSense would proactively patch in a customer service supervisor in advance of any party asking to speak with one.

**MATERIALS AND DOCUMENTS REVIEWED AND RELIED ON**

32. In conducting the preliminary analysis in this declaration and preparing my opinions, I relied upon the following materials and information that were provided to me by Defendant's counsel:

a. The First Amended Complaint;

b. Answer and Affirmative Defenses to First Amended Complaint;

c. Athena's Responses to Plaintiff's First Set of Interrogatories, Second Set of Interrogatories, First Request for Production, Second Request for Production, and First Requests for Admission;

d. *AB000001- Text Message Log re 57716 to Athena Customer Phone Numbers.xlsx* ("Call Detail Report", or "CDR");

e. *AB000002- Do Not Call-Text List.xlsx*; and,

f. *AB000835.xlsx*; and;

g. *Plaintiff's expert, Anya Verkhovskaya.report_executed.pdf*, and the exhibits attached thereto.

33. In conducting the preliminary analysis in this declaration and preparing my opinions, I also relied on the following electronic databases that are available to me:

a. The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database;

b. External, publicly available databases, including iConectiv's WDNC[1,2] for use in identifying the type of line (and the carrier) and the Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC[3].

34. As part of my expertise with engaging with call centers, I am aware of the necessary adherences to 47 CFR 64.1200(d), 47 U.S.C.A. § 227(c), Fla. Stat. Sec. 501.059(5). I have not seen any indication within the data that indicates that a random or sequential number generator is used (i.e. an automated telephone dialing system).

**BASIS FOR MY OPINIONS**

**Methods and Tools Used to Analyze Records.**

34. I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have

---

[1] FCC order FCC-15-35A1 (03/27/2015) explicitly mandated *continued* availability of iConectiv's data for purposes of compliance with the TCPA. (¶.142). The historical information *does not* contain subscriber information, only carrier of record and line type. Before number portability, this would have been a simple task of looking at the Local Exchange Routing Guide ("LERG"), or absent access to the LERG, finding the area codes and prefixes from an online collection of national phone books. TelSwitch, Inc. is a reseller and authorized user of iConectiv data.

[2] In *Perrong v Call Identified as Connor* (Case No. 1:22-cv-04479-CPO-EAP, DC, New Jersey, Camden Vicinage), "plaintiff has queried the database of iConectiv, the company charged by the Federal Communications Commission to administer the Number Portability Administration Center, which is the master database which lists which telephone provider services a particular number, among other information required to route telephone calls to the proper provider" (ECF 3)

[3] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10376173-476173-21.

been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

35. By using a set of standardized SQL queries, I am able to tag each record within the text message detail files ( "Call Detail Records" or "CDR") according to (a) the date of the text; and (b) the disposition of the text, if one is present; and (c) whether the number to which the text was sent was associated with a Wireless service on the date of the record; and, (d) any other data field contained in the text message records. I am also able to add (e) whether the number was on the National DNC list[4], and, (f) whether the number to which a message had been sent had been tagged with a "STOP" request; and (g) whether the number to which the message had been sent had been tagged with a "STOP" request more than thirty (30) days before the transmission of a text message.

36. Using SQL, I am able to also associate other information that is extrinsic to the worksheets provided that may provide additional guidance to the trier of fact, such as the name of the telephone company to which the number was serviced by on the date that the number was texted.

**Preliminary Data Organization, Cleansing, and Filtering**

37. I started by opening the *AB000001- Text Message Log re 57716 to Athena Customer Phone Numbers.xlsx* ("CDR") I do this to (a) determine the format that the text message detail records were stored in, and then (b) to determine what pre-processing that I would need to conduct in order to achieve an import of the text messages. I then opened *AB000001B- with status - 2020-08 - 2024-08.xlsx*

[4] I use the national DNC list as a measurement of whether a number is "residential" in nature.

("Status") files to tag the texts as to the status of delivery so that I could identify which records were in fact delivered.

38. I then performed the activities upon the CDR files:

39. I started by importing the 1,469,863 records from the CDR files into a SQL database tables using Microsoft SQL™ Service Management Studio to apply a set of filters:

a. From the 1,469,863 records within the CDR file, I identified 16,601 "incoming" messages and 1,453,262 "outgoing" messages. I did this so that I could topically align the "incoming" messages containing "STOP" with the outgoing messages that were being sent *from* the Defendant.

b. I then applied a tag called "isStop" to the incoming messages that contained the following identifiers: (body = 'NO'}, (body like '%stop%'}, (body like '%cancel%'}, (body like '%dont%'}, (body like '%remove%'}, (body like '%fuck%'}, (body like '%don''t text%'}, (body like '%don''t call%'}, (body like '%quit%'}, (body like '%no more%'}, (body like 'NO thanks%'}, (body like 'END%'}, (body like '%dont%'}, (body like '%do not%'). In sum, I was able to identify 11,357 "STOP" requests.

c. I then removed 1,247 outbound messages that were sent to a telephone number that was not contained on the FTC's TCPA-eligible area code list.

d. I then performed an operation to identify 52,716 unique messages where the text had been contained on more than *one* row within the CDR files. An example of this is as follows:

| | | | |
|---|---|---|---|
| 52159 | AB000001· | Part_2 | ATHENA BITCOIN, we noticed that you visited our ATM! If you want customer service to help you with your transaction, or if you had any problem call now to 312-6 |
| 52160 | AB000001· | Part_2 | 90-4466. Have a great day! |
| 52161 | AB000001· | Part_2 | Your ATM verification code is 96893 |

As an example, this is one message that was sent to an individual message – not the three messages that appear within the output. It is important to capture all of the body of the message, and then align it as one record otherwise it would appear as multiple messages had been sent rather than just one (1) that had actually been sent:

| | | | |
|---|---|---|---|
| 52159 | AB000001 | Part_2 | ATHENA BITCOIN, we noticed that you visited our ATM! If you want customer service to help you with your transaction, or if you had any problem call now to 312-6 90-4466. Have a great day! Your ATM verification code is 96893 |

e. I then removed 1,250,904 messages to 126,334 unique numbers where the number to which the message had been sent had *never* requested STOP.

f. I then removed 9,678 messages that contained an acknowledgement of "STOP".

g. Finally, I removed 87,285 messages that were sent to individuals who *had* requested STOP, but the messages were sent to the individual *before* a STOP had been requested. At this step, there were a total of 19,299 messages sent to individuals where the message was sent *after* the STOP had been received. To the remaining 19,299 messages that were sent to individuals where the message was sent *after* STOP had been received, I removed 825 messages that were sent *after* STOP, but less than thirty (30) days from the date indicated on the STOP. This left 18,474 messages that had been sent.

h. Finally, to the 18,474 messages, I removed 1,663 messages to 631 unique telephone numbers where Ms. Verkhovskaya identified the telephone number as having received one (1) or more messages *after* a STOP, but I am unable to find any to those numbers.

i. Finally, to the 16,811 remaining numbers, I was asked to identify, using the FTC's Do-Not-Call list, the quantity of telephone numbers that appeared on the DNC list, as an identification of numbers that were presumptively *Residential*. After reduction of 8,068 messages that were sent to numbers that were *not* on the residential list, there remained 8,725 messages that had been sent to 1,056 telephone number that were also on Anya Verkhovskaya's list. 631 telephone numbers on Ms. Verkovskaya's list did not have any messages sent to them.

40. In sum, there were 631 telephone numbers on Ms. Verkhovskaya's list that did *not* receive any messages after a STOP message. The reasons for these can be broken down into three reasons:

**Opinions:**

41. Ms. Verkhovskaya's over-inclusion of telephone numbers appears to be predominately in the following two areas:

(a) Ms. Verkhovskaya included messages that were made less than thirty (30) days after a STOP. There are 392 telephone numbers included in Ms. Verkhovskaya's index where there were *no* text messages sent to the phone number more than thirty (30) days *after* "STOP". It is my experiences that messages that are sent within thirty (30) days after the receipt of a STOP should not be included. Ms. Verkhovskaya's analysis includes these.

| dateTime | body |
| --- | --- |
| 6/1/23 4:12 PM | ATHENA BITCOIN, we noticed that you visited our ATM! If you want customer se |
| 6/1/23 4:12 PM | 90-4466. Have a great day! |
| 6/1/23 4:12 PM | Your ATM verification code is 34785 |
| 6/1/23 4:17 PM | Your ATM verification code is 65858 |
| 6/1/23 4:34 PM | Your ATM verification code is 57901 |
| 6/1/23 4:37 PM | Your ATM verification code is 47384 |
| 6/1/23 6:05 PM | Your ATM verification code is 48616 |
| 6/1/23 6:22 PM | Your ATM verification code is 07745 |
| 6/1/23 6:27 PM | Your ATM verification code is 01331 |
| 6/1/23 7:47 PM | Your ATM verification code is 93268 |
| 6/15/23 10:05 AM | Save big! Enjoy 25% OFF your next Bitcoin purchase at our ATMs until 06/19/23. |
| 6/15/23 3:31 PM | Stop |
| 6/15/23 3:31 PM | STOP received. You will no longer receive marketing messages. |
| 6/21/23 3:35 PM | Exciting news! Discover our latest locations featuring Athena Bitcoin ATMs. Disc |
| 6/21/23 7:14 PM | Exciting news! Discover our latest locations featuring Athena Bitcoin ATMs Disc |
| 6/29/23 9:12 AM | Happy 4th of July! Get 25% OFF your next Bitcoin purchase at our ATMs. Offer e |
| 7/4/23 3:45 PM | Happy 4th of July! Remember, Get 25% OFF your next Bitcoin purchase at our At |

b) Ms. Verkhovskaya included messages that were made to multiple numbers that had presumably resumed business relationships with the Defendant by their continued use of the Athena ATM's. This is an example of an individual who requested "STOP" after several marketing messages were received. The individual was no longer sent any marketing messages, until

such point in time when the individual had used the Athena ATM. After that, marketing messages resumed, until another "STOP" request had been received, after which there were no more messages. Messages to this individual appears on Ms. Verkhovskaya's index of affected numbers, but should not have been included:

| datetime | status | originalBody |
|---|---|---|
| 8/17/23 12:05 AM | delivered | ATHENA BITCOIN, we noticed that you visited our ATM! If you want customer service |
| 8/17/23 12:31 AM | delivered | Your ATM verification code is 34505 |
| 8/18/23 12:42 AM | delivered | Your ATM verification code is 99118 |
| 8/24/23 10:55 PM | delivered | Limited Time Offer! 15% OFF your next purchase at Athena Bitcoin ATMs. Ends 8/31/2 |
| 8/31/23 6:31 PM | delivered | Flash Sale Alert! Get 25% off your next purchase at Athena Bitcoin ATMs. Ends 9/3/20 |
| 9/27/23 9:58 PM | delivered | Farewell September! Celebrate it with 25% OFF your next purchase at our Athena Bit |
| 9/27/23 10:00 PM | delivered | STOP received. You will no longer receive marketing messages. |
| 10/14/23 2:51 PM | delivered | Your ATM verification code is 72892 |
| 10/16/23 10:31 PM | delivered | Your ATM verification code is 85589 |
| 11/22/23 1:07 AM | delivered | Exclusive Black Friday Deal! Get 25% OFF on your next Bitcoin purchase at our ATMs. I |
| 12/7/23 8:24 AM | delivered | Start December Right! Enjoy 10% OFF your next Bitcoin purchase at our ATMs. Don't r |
| 12/13/23 3:40 AM | delivered | Quick Reminder! Your 10% OFF on Bitcoin purchases is only valid until 12/17/23. Find |
| 12/20/23 3:30 AM | delivered | Gift BTC Magic! Celebrate Christmas with 25% OFF your next Bitcoin purchase at our A |
| 12/30/23 2:06 AM | delivered | Start the year right and enjoy 20% OFF at Athena Bitcoin ATMs! Explore now: https:// |
| 4/19/24 2:22 AM | delivered | Halving Sale Alert! Enjoy 25% OFF your next Bitcoin purchase at our ATMs: https://ath |
| 4/19/24 2:23 AM | delivered | STOP received. You will no longer receive marketing messages. |

42. Finally, it does not appear that Ms. Verkhovskaya counted the quantities of the messages that had been sent to the individuals on her list. I am unable, therefore, to identify from Ms. Verkhovskaya's limited work product, the quantity of messages that were sent to unique numbers. I have also been unable to identify or locate any of the underlying SQL databases that Ms. Verkhovskaya cites in her report, nor have I identified any of the actual instructions that she used to construct her analysis.

43. Attached as Exhibit 6 are the SQL statements that I used to form my opinions. Exhibit 7 contains a list of the telephone numbers that were contained within Ms. Verkhovskaya's final conclusions that do not appear to have any messages that had been sent to those numbers more than thirty (30) days from the receipt of a 'STOP' request.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on January 13th, 2025 in Pleasant Hill, California.



Aaron Woolfson